AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

**FILED**
11/29/2022
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY        vyc        DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)   Case No.   22MJ8793
Blue Apple iPhone )
Model: iPhone 13 )
IMEI: 355402935351071 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the    Southern    District of    California   , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324 | Transportation of Illegal Aliens |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Moncerad Soto incorporated herein by reference.

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Border Patrol Agent Moncerad Soto
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by    telephone    *(specify reliable electronic means)*.

Date: 11/29/2022

*Judge's signature*

City and state:   El Centro, California         HON. LUPE RODRIGUEZ, JR., US MAGISTRATE JUDGE
*Printed name and title*

## ATTACHMENT A-2
PROPERTY TO BE SEARCHED

The following property is to be searched:

**A-2:**     Blue Apple iPhone
Model: iPhone 13
IMEI: 355402935351071
Seized from Everardo SANCHEZ-Castaneda
**(Target Device #2)**



The **Target Device** is currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## **ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the mobile telephone described in Attachments A-1 to A-4 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Devices for evidence described below.

The evidence to be seized from the mobile telephone will be electronic records, communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data limited to the time period of August 28, 2022, up to and including September 28, 2022, and is limited to the following:

 a. tending to reflect planning of and/or involvement in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

 b. tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, and/or phone numbers – that may contain electronic evidence tending to indicate efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

 c. tending to identify co-conspirators, criminal associates, or others involved in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

 d. tending to identify travel to or presence at locations involved in efforts to smuggle illegal aliens into and through the United States;

 e. tending to identify the user of, or persons with control over or access to, the Target Device;

 f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which is evidence of the transportation of illegal aliens in violation of Title 8 U.S.C. § 1324.

# AFFIDAVIT

I, Moncerad Soto, United States Border Patrol Agent, having been duly sworn, depose and state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrant(s) to search the following electronic device(s):

**A-1:**	Samsung Galaxy
Model: A32 5G
IMEI: 353245902959851
Seized from Rafael NUNEZ-Parra
**(Target Device #1)**

**A-2:**	Apple iPhone
Model: iPhone 13
IMEI: 355402935351071
Seized from Everardo SANCHEZ-Castaneda
**(Target Device #2)**

**A-3:**	Samsung Galaxy
Model: A53 5G
IMEI: 354840271279797
Seized from Jesus RUIZ-Carrasco
**(Target Device #3)**

**A-4:**	Motorola
Model: Moto G Power Android II
IMEI: 351016562097387
Seized from Jesus RUIZ-Carrasco
**(Target Device #4)**

as further described in Attachments A-1 to A-4, and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Conspiracy to Transport Illegal Aliens), as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Rafael NUNEZ-Parra (NUNEZ), Jesus RUIZ-Carrasco (RUIZ) and Everardo SANCHEZ-

Castaneda (SANCHEZ), for conspiring to transport aliens in violation of Title 8 U.S.C. § 1324 within the Southern District of California. The Target Devices were seized from Jesus RUIZ-Carrasco (RUIZ), Rafael NUNEZ-Parra (NUNEZ) and Everardo SANCHEZ-Castaneda (SANCHEZ) on or about September 27, 2022, incident to their arrest. The Target Devices are currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

3.  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth every fact that I, or others, have learned during the course of this investigation. The information contained in this Affidavit is based upon my personal observations and knowledge, my review of various official reports, and upon conversations with other Border Patrol Agents. Dates and times are approximate.

## EXPERIENCE AND TRAINING

4.  I am a United States Border Patrol Agent with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP"). I have been employed as a full-time, sworn federal BPA with the USBP since February 2016, and graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico. The 20-week Academy curriculum covers specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21, United States Code, Controlled Substances law, and in Title 19, United States Code, Customs law.

5.  I am currently assigned to the El Centro Sector Prosecutions Unit. The El Centro Sector Prosecutions Unit is tasked with the responsibility of investigating and prosecuting alien smuggling organizations that utilize the Southern and Central Districts of California as an operational corridor. In the course of my duties as a Border Patrol Agent, I investigate and prepare cases for prosecution against persons involved in the inducement of the illegal entry of undocumented aliens into the United States; the smuggling of

undocumented aliens into the United States; and the transportation and harboring of undocumented aliens within the United States.

6. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

7. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to

make smuggling arrangements, receive instructions, and report their locations after crossing.

8. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

9. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

10. On September 27, 2022, Border Patrol Agents assigned to the El Centro Sector Intelligence Unit's Field Intelligence Team (FIT) were conducting surveillance in Calexico, California. The FIT wears plain clothes and drives unmarked Service vehicles in order to blend in with the general public. FIT conducts surveillance and investigations on known smugglers and smuggling transportation cells operating in the Imperial Valley.

11. At approximately 6:19 p.m., Supervisory BPA M. Clinton received an alert on his government issued phone regarding a 2003 Toyota Camry (Toyota) bearing California license plates. Record checks revealed that the Toyota was recently acquired by NUNEZ. Since the Toyota was acquired by NUNEZ, the Toyota has displayed a travel pattern consistent with illicit activity. The Toyota has conducted quick east to west trips on Interstate-8 from the Imperial Valley towards Yuma, Arizona and subsequently returning northbound on Highway 86. The Toyota also made a two-hour round trip into Mexicali, Mexico, then back north into the United States. During this time, BP investigation revealed NUNEZ posted Facebook stories related to his travel in Mexico and posted pictures flashing several hundred-dollar bills. Based on current trends and Agents' experience, Agents believed that NUNEZ may be transporting illegal aliens to Yuma. Agents believed that NUNEZ may also be acting as a cash courier for a Transnational Criminal Organization (TCO). Prior to September 27, 2022, alerts were placed in law enforcement systems to target NUNEZ and his vehicle for enforcement. The alert indicated that the Toyota was currently travelling eastbound on Interstate 8 towards Yuma, Arizona. After receiving the alert, BPA M. Clinton relayed this information to additional FIT Agents who were in the area. FIT Agents parked on Interstate 8 and began observing traffic in search of the Toyota.

12. At approximately 6:40 p.m., BPA G. Castaneda, who was positioned on Interstate 8 at the Ogilbly Road Exit, observed a Toyota matching the description pass his location. At this time, uniformed Calexico Border Patrol Agents were actively tracking several different groups of suspected illegal aliens in the area. As the Toyota passed his location, BPA G. Castaneda observed a driver, front seat passenger and one rear seat passenger. BPA G. Castaneda relayed this information to additional FIT Agents, caught up to the Toyota and positioned his unmarked service vehicle behind the Toyota. Once BPA Castaneda was directly behind the Toyota, the driver reduced his speed drastically. BPA G. Castaneda then queried the license plate through sector dispatch.

13. Record checks showed that the vehicle had a registration with a release of liability and pending master file. Based on current trends and Agents' experience, Agents know that alien smugglers routinely utilize vehicles which are in the process of a change of ownership (release of liability/pending master file). As the Toyota approached the Sidewinder Road exit on Interstate 8, BPA G. Castaneda activated the emergency lights and sirens of his unmarked service vehicle in order to conduct a vehicle stop on the Toyota. The Toyota slowed down, pulled over to the side of Interstate 8 and came to a complete stop. After the Toyota Came to a complete stop, BPA G. Castaneda approached the Toyota with Border Patrol markings and insignia fully visible.

14. BPA G. Castaneda approached the passenger side of the Toyota and observed the driver, later identified as NUNEZ, and a male front seat passenger, later identified as SANCHEZ. BPA G. Castaneda identified himself as a Border Patrol Agent and questioned NUNEZ as to his citizenship to which NUNEZ stated that he was a United States Citizen. After observing the rear seat passenger, BPA G. Castaneda questioned NUNEZ as to how he knew the two passengers in the Toyota and NUNEZ stated: "I don't know them, I'm just giving them a ride."

15. BPA G. Castaneda then questioned SANCHEZ and the additional passenger, later identified as RUIZ, as to their citizenship. SANCHEZ and RUIZ admitted to being in the United States illegally. NUNEZ, SANCHEZ and RUIZ were subsequently placed under

arrest. Both SANCHEZ and RUIZ admitted they made the illegal entry by climbing the border fence and by walking through an area other than through a designated Port of Entry.

16. While conducting an inventory search of the vehicle, BPA G. Castaneda observed a black backpack on the floor of the front passenger seat, where SANCHEZ had been sitting. BPA Castaneda opened the backpack and observed a brown handgun. The handgun was retrieved and cleared for officer safety. The handgun had a loaded magazine with 13 rounds of ammunition. Further investigation showed the handgun is a nine (9) millimeter "ghost gun" with no serial number and there was no round in the chamber. Additionally, BPA Castaneda noticed a Jack in the Box brown food bag also on the floor of SANCHEZ's seat (the front passenger seat). Agents picked up the bag and noticed that it felt heavy and hard. Agents looked inside the bag and observed ketchup and hot sauce packets as well as napkins along with several bundles of currency concealed under the napkins. Agents questioned NUNEZ, SANCHEZ and RUIZ regarding the money and the handgun and they all denied ownership of the items. A search of SANCHEZ's person also revealed a small amount of a substance that appeared to be cocaine in his pants pocket. The money, firearm, and suspected narcotics were seized and transported to the Calexico station for processing.

17. At the Calexico Station, the currency from the bag was inventoried and totaled $23,250 United States Dollars (USD). An additional $2,644 USD and $1,000 Mexican Pesos (MXN) were found SANCHEZ's possession and $612 USD was found in RUIZ's possession. NUNEZ, SANCHEZ and RUIZ all denied any ownership of any of the currency. In total, $26,506 USD and $1,000 MXN were seized as evidence. The firearm, magazine, thirteen (13) rounds of ammunition, and cocaine were also seized as evidence.

18. BPA Clinton advised NUNEZ of his Miranda Rights at the Calexico Station. NUNEZ acknowledged his rights and agreed to answer questions without the presence of an attorney. NUNEZ stated he was driving his car during today's event and that he had purchased the car a few months ago. NUNEZ acknowledge that the car is not registered in his name yet, but claims that he paid $3,000 for it. NUNEZ stated that he was at Andy's

Gas Station in Thermal and he saw two individuals asking for a ride. NUNEZ claimed that he sometimes works as a "Raitero," which is an unlicensed taxi. NUNEZ stated that he picked up the two people at the gas station and was charging them $100 each for a ride to Yuma. NUNEZ stated that he did not ask the two individuals if they were illegal aliens because he knew he would not be driving through an immigration checkpoint. NUNEZ stated that he had never met these men before today's date and does not know them. NUNEZ admitted he had previously been arrested for alien smuggling when he was a juvenile, but claims he was innocent. NUNEZ denied knowing about the large amount of currency and denied ownership of it. NUNEZ could not explain how the Jack in the Box bag got in the car. NUNEZ was also asked about the handgun located in the backpack in the front seat of his vehicle. NUNEZ denied knowledge of the firearm and denied ownership of it.

      19.    BPA A. Garcia advised RUIZ of his Miranda Rights at the Calexico Station. RUIZ acknowledged his rights and agreed to answer questions without the presence of an attorney. RUIZ stated that he illegally entered the United States in mid-July of this year and is currently residing in Indio. RUIZ stated that he was to pay $13,000 to be illegally smuggled into the United States, and that he is paying off the smuggling fee by smuggling other illegal aliens on the train. RUIZ stated he has smuggled on the train at least on eight different occasions. RUIZ stated that he is paid $120 for each illegal alien successfully smuggled. RUIZ stated that he averages about ten (10) illegal aliens per trip. RUIZ stated that he works for another individual and that he and another smuggler are to load the train with people and make sure that they are delivered north of the Border Patrol checkpoints. RUIZ stated that the driver that he was arrested with today brought him to the train on two previous occasions. RUIZ stated the individual he works for sends him locations on WhatsApp where he is to wait for the driver. RUIZ stated that he is to pay the driver $500 every time he brings him to the train in Yuma. RUIZ stated that SANCHEZ was already in the vehicle when he showed up. RUIZ stated that during the trip to Yuma, SANCHEZ, whom he had never met, showed the driver a handgun and told him it was a nine (9)

millimeter. RUIZ stated that the Red Bolt Cutters found within his property is how he gets the train compartments open for smuggling aliens on the train. RUIZ was presented with a six pack photo line-up and identified Photo #6 (NUNEZ) as the driver of the vehicle.

20. In a search incident to their arrest: Target Device #1 was found on NUNEZ's person and was seized as evidence; Target Device #2 was found on SANCHEZ's person and was seized as evidence; Target Device #3 and Target Device #4 were found on RUIZ's person and were seized as evidence.

21. Based upon my experience and investigation in this case, I believe that NUNEZ, RUIZ, SANCHEZ, and other persons, as yet unknown, were involved in an alien smuggling venture and that NUNEZ, RUIZ and SANCHEZ used the Target Devices to coordinate with the as yet unknown persons to bring the aliens into the United States and/or transport them further into the United States. Additionally, I believe that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures, and other digital information are stored in the memory of the Target Devices, which may identify other persons involved in alien smuggling activities.

22. I am aware that smuggling conspiracies require planning to successfully evade detection by law enforcement. In my professional training and experience, this may require planning and coordination in the days and weeks prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine their whereabouts. Given this, I respectfully request permission to search the Target Devices for data beginning on August 28, 2022, up to and including September 28, 2022, the day after the arrest of NUNEZ, RUIZ and SANCHEZ.

## METHODOLOGY

23. It is not possible to determine merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be

9

simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books, and can be mini-computers allowing for electronic mail services, web services, and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and, instead, store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24. Following the issuance of this warrant, a case agent familiar with the investigation will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the telephones, and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this Court.

//

## CONCLUSION

26. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that NUNEZ, RUIZ, and SANCHEZ used the Target Devices to facilitate the offense of alien smuggling. The Target Devices likely were used to facilitate the offense by transmitting and storing data, specifically that described in Attachment B, which constitutes evidence of violations of Title 8, United States Code, Section 1324. I also believe that probable cause exists to believe that evidence of illegal activity committed by NUNEZ, RUIZ, and SANCHEZ, the Material Witness, and others continues to exist on the Target Devices. Therefore, I respectfully request that the Court issue this warrant.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Moncerad Soto, Border Patrol Agent
United States Border Patrol

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 29th day of November, 2022.

3:47 p.m.
_____
HON. LUPE RODRIGUEZ, JR.
UNITED STATES MAGISTRATE JUDGE

11

## ATTACHMENT A-1
PROPERTY TO BE SEARCHED

The following property is to be searched:

**A-1:** Samsung Galaxy
Model: A32 5G
IMEI: 353245902959851
Seized from Rafael NUNEZ-Parra
**(Target Device #1)**



The **Target Device** is currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## ATTACHMENT A-2
PROPERTY TO BE SEARCHED

The following property is to be searched:

**A-2:**            Blue Apple iPhone
                    Model: iPhone 13
                    IMEI: 355402935351071
                    Seized from Everardo SANCHEZ-Castaneda
                    **(Target Device #2)**



The **Target Device** is currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## ATTACHMENT A-3
PROPERTY TO BE SEARCHED

The following property is to be searched:

**A-3:** Black Samsung Galaxy
Model: A53 5G
IMEI: 354840271279797
Seized from Jesus RUIZ-Carrasco
**(Target Device #3)**



The **Target Device** is currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## ATTACHMENT A-4
PROPERTY TO BE SEARCHED

The following property is to be searched:

**A-4:**	Purple Motorola
Model: Moto G Power Android II
IMEI: 351016562097387
Seized from Jesus RUIZ-Carrasco
**(Target Device #4)**



The **Target Device** is currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

# **ATTACHMENT B**

## ITEMS TO BE SEIZED

Authorization to search the mobile telephone described in Attachments A-1 to A-4 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Devices for evidence described below.

The evidence to be seized from the mobile telephone will be electronic records, communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data limited to the time period of August 28, 2022, up to and including September 28, 2022, and is limited to the following:

a. tending to reflect planning of and/or involvement in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

b. tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, and/or phone numbers – that may contain electronic evidence tending to indicate efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

d. tending to identify travel to or presence at locations involved in efforts to smuggle illegal aliens into and through the United States;

e. tending to identify the user of, or persons with control over or access to, the Target Device;

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which is evidence of the transportation of illegal aliens in violation of Title 8 U.S.C. § 1324.